[No. A082341. First Dist., Div. Four. Oct. 25, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE RAMON GARCIA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.C, II.D.1, II.F.1 and II.G.

318

**COUNSEL**

Noel & Knoller, Robert E. Noel and Marjorie F. Knoller for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Gregory A. Ott, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, J.\***—Jose Ramon Garcia, a former guard at Pelican Bay State Prison, appeals from his conviction for conspiring to assault and for assault upon an inmate who was targeted for attack because he was serving time for child molestation. (Pen. Code, §§ 182 & 245, subd. (a)(1).)[1] For these crimes and for two counts of possessing alcohol in the prison (§ 4573.8) defendant was sentenced to a term of four years and eight months. We affirm that conviction.

### I. *Background*

The charges against defendant arose from his conduct beginning in January 1994 through September 1995 while he was employed as a correctional officer at Pelican Bay State Prison. The theory of the People's case was that defendant together with his friend and supervising officer, Sergeant Mike Powers who supervised A yard, conspired with the shot-callers (inmates who are the political power brokers for their gang or racial group) to organize attacks on inmates who had been convicted of molestation of, or criminal acts committed upon, children. Defendant and Powers would provide confirmation from prison records that the targeted inmates had been convicted of such a crime or crimes and the shot-callers would solicit or direct another inmate to commit the attack.

The relationship between defendant and the shot-callers was one of mutual favors. Defendant was especially friendly with inmate Branscum who testified that he received deodorant, cologne, silk undershorts, street food, liqueur-filled chocolates, and small quantities of street alcohol from Garcia. Other inmates received similar gifts from defendant, or special favors such as single cells. Branscum learned from Garcia about the commitment offenses of inmates involved in crimes against children, then he in turn showed the paperwork to other shot-callers who arranged the assaults on the targeted inmates.

For their part Powers and defendant protected the inmate assailants by offering assurances that the officers in the gun towers would not shoot in response to an attack, or would report the victim to have been the aggressor. Defendant told inmate Patin that if defendant was in the gun tower when there was an attack upon a child molester and there was an order to "get down," Patin should comply and defendant would shoot to kill the child molester and would report that the molester had been the aggressor.

---

*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Unless otherwise noted all subsequent statutory references are to the Penal Code.

Another self-professed shot-caller for the whites, inmate Bacos, testified that he was summoned to the A yard dining hall run by Garcia for a job interview, and there Bacos was shown paperwork on an inmate committed for child molestation. Bacos testified to the care he took to be sure that an inmate targeted for assault was a child molester, a snitch or a rapist. He explained, "[I]f you were to whack somebody that didn't have it coming . . . it would fall back on my head and it would decrease my power base." After Branscum showed Bacos the confidential document from the inmate's prison file, Branscum told Bacos that defendant needed to return the document "immediately."

Investigations conducted by the internal security department of the prison, by an investigative arm of the Department of Corrections and by local law enforcement and the FBI led first to Officer Garcia being relieved of his duties at the prison on September 29, 1995, and eventually to these charges being brought. As a result of these various investigations, Officer Garcia's statements were preserved in interviews dating from the fall of 1995 through early 1996.

The case was tried to a jury in a lengthy trial spanning some three months at which some 93 witnesses, many of whom were inmates or former inmates at Pelican Bay, testified. Defendant testified on his own behalf. The jury returned verdicts finding defendant guilty of conspiracy to assault (§§ 182, 245, subd. (a)(1)), assault (§ 245, subd. (a)(1)) and two counts of possessing alcohol in prison (§ 4573.8), but was unable to reach a verdict on two counts of bringing alcohol into a prison (§ 4573.5), one count of possessing a weapon in prison (§ 4502, subd. (a)) and one count of assault with a deadly weapon on inmate Herrera (§ 245, subd. (a)(1)).

## II. *Discussion*

Defendant's primary contention is that there was insufficient competent evidence of either conspiracy to assault or of assault with great bodily force; specifically he argues there was no evidence apart from the uncorroborated testimony of a coconspirator as to defendant's intent. As to his convictions for possession of alcohol, defendant maintains that the People did not prove that his possession was unauthorized and therefore that the court erred by not granting his motion in arrest of judgment as to the alcohol counts. Finally, defendant maintains that he was denied a fair trial because of misconduct by the Department of Corrections and the Del Norte County District Attorney that deprived him of exculpatory evidence that would have shown he was being framed.

## A. *Conspiracy and Assault*

Defendant defines the issue as whether or not the People presented a prima facie case of either conspiracy to commit assault with force likely to cause great bodily harm (count 5) or of assault with force likely to cause great bodily harm (count 8). Our task on review of a judgment entered upon jury verdicts is simply to determine whether or not there is substantial evidence to support his conviction on those counts.

In assessing a claim of insufficient evidence on appeal, this court reviews the entire record in the light most favorable to the judgment to determine if it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The standard remains the same in cases in which the prosecution relies primarily upon circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Thus, while the jury must acquit if the circumstantial evidence is capable of two interpretations, one suggesting guilt and one suggesting innocence, once the jury concludes defendant is guilty that determination is upheld on appeal providing that the circumstances reasonably justify the jury's determination. (*Id.* at pp. 792-793.)

### 1. *Assault on Inmate Rose*

The overt act element of the count of conspiracy to assault and of the assault count (§ 245, subd. (a)(1)) involved a September 9, 1995, assault on inmate Robert Rose. The 52-year-old Rose had been convicted of multiple counts of child molestation. Defendant was in the control booth at about 11:00 a.m. when the door to Rose's cell was opened by defendant, who then told Rose to go to the day room and wait for a superior officer. About 10:15 o'clock that morning Rose had sent a note to defendant asking for an emergency housing change because Rose feared he was about to be attacked by inmates as they had been questioning him about his commitment offenses. Because of this fear Rose had not gone onto the yard that day.

Sometime early that day inmate Caudle was told by his cellmate Hickerson that Rose would be available in the day room after the inmates came off the yard and that "we had a green light or the okay to basically assault him." Shortly after the two cellmates came off the yard, Hickerson called Caudle over to the door of the cell which had been opened; Hickerson put his arm around Caudle's shoulder and looked up at defendant in the control tower

who nodded and then shut the cell door. Hickerson explained this maneuver was necessary so defendant could identify Caudle. A minute or so later the door opened again and Caudle left the cell and went to the day room where Rose was already seated looking at the control tower. Caudle also took a seat and looked up at defendant who responded by nodding his head toward Rose.

The 23-year-old, 250-pound Caudle approached the still-seated Rose and began punching Rose from behind in the back, head and neck with such force that Rose was knocked to the floor some five or six feet away. Rose testified that he quickly assumed a "defensive position" on his knees with his hands over his head. Defendant gave a get-down order from the control booth, but Caudle took the time to kick Rose in the head before he complied.

Caudle testified that he heard "Garcia yell to get over on our stomachs then I heard a shot . . . . I heard 'get on your stomach,' another shot, 'get back on your stomach,' another shot, and that's when the firing quit."

Caudle testified that he saw no reason—either because he was still attacking Rose or because Rose was resisting him—for any of the three shots to be fired. Rose testified that he looked up only once and "caught a glimpse of" his attacker "scrambling to turn over and lay down in prone position." Officer Roberts heard defendant yell and discharge the first shot and ran over to see what was happening. When he looked down into the day room he saw "three inmates in the prone position."[2] Defendant asked for and received two more rounds from Officer Roberts. While Officer Roberts was at the door waiting to admit backup officers he heard a second shot, but when he looked down "the inmates were in the same exact positions I'd just last seen them. Nobody had moved." Officer Roberts returned to the door where he now heard the responding officers when defendant twice yelled, "I told you not to move," and fired a third round. Officer Pofahl was one of the responding officers and he testified that as he waited for admittance into the day room he looked through the glass door and the windows, but didn't see any movement in that room. It was while he was waiting that he heard the third shot.

The weapon that defendant was using was a 37-millimeter gas gun which shoots a wooden projectile referred to as a "block." While the blocks are apparently intended to be nonlethal, if they are fired at close range or hit a vulnerable spot they can cause serious injury or death.

---

[2]Roberts was the only witness to testify to three inmates being present at the time of the attack.

### a. *Direct Assailant*

The prosecutor proceeded on two theories of assault, one of which was that defendant assaulted inmate Rose when he fired three "blocks" from a 37-millimeter gas gun at him. Defendant contends that the only evidence that his repeated shots during the Rose assault were unnecessary was the testimony of inmate Caudle. Because a conviction cannot be sustained on uncorroborated accomplice testimony, and a coconspirator is an accomplice for this purpose (*People v. Williams* (1997) 16 Cal.4th 153, 245 [66 Cal.Rptr.2d 123, 940 P.2d 710]), defendant argues that the evidence to support his assault conviction is insufficient. (§ 1111.)

Corroboration may be supplied by circumstantial evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Corroborating evidence must implicate the defendant in the crime and must be related to some act or fact, which is an element of the crime, though it need not be sufficient in itself to establish the elements of the crime. (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

The testimony of Officers Roberts and Pofahl and inmate Caudle was completely consistent with the crucial element of Caudle's account—namely that at least one or more shots from the gas gun were fired by defendant after the two inmates involved in the fight were on the floor and had quit moving. A reasonable trier of fact could conclude that defendant shouted at the inmates while Officer Roberts was at the door and before Officer Pofahl entered to make it seem that the second two shots were necessary. Such a scenario would be consistent with the fact that neither of the other officers saw any movement or a change of position by Caudle or Rose. The testimony of Caudle that at least some of the shots were unnecessary was adequately corroborated.

### b. *Accomplice/Coconspirator Liability*

A conspiracy under section 182, subdivision (a)(1) is committed when two or more persons conspire to commit any crime. Conviction of a conspiracy requires proof first, that defendant and another person or persons had the specific intent to agree or conspire, and second, that they had the specific intent to commit the elements of the offense as well as proof of the commission of an overt act in furtherance of the conspiracy by one or more parties to the agreement. (*People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) A conspirator is legally liable for the acts of confederates that follow from the common design or purpose as a probable or natural consequence. (*Id.* at p. 417.)

 Coconspirators are treated as accomplices for the purpose of meeting the corroboration requirement of section 1111. (*People v. Williams, supra,* 16 Cal.4th at p. 245.)

The evidence was also sufficient to support defendant's liability as an accomplice in the assault on Rose. Rose testified that when he gave his note to defendant at 10:15 a.m., before reading it, defendant told Rose, "[W]e'll take care of you." From this statement a trier of fact could infer that defendant already knew about Rose's concern for his own safety, and that defendant sought to allay Rose's fears in order to get him into the day room where he would be vulnerable to attack.

This line of reasoning would be consistent with the overt act finding made by the jury. The overt act which was found true was that "Defendant gave Inmate Caudle the 'green light' to assault Inmate Rose whom Caudle then attacked with fists & whom Defendant then fired 3 gas rifle rounds at." At trial there was evidence of defendant's stated hostility to child molesters. There was also testimony that the attack on Rose was approved by the shot-caller Bacos which was consistent with other attacks ordered by the shot-callers on prisoners who had committed crimes against children. It was defendant who at a time when he was alone in the control tower released Rose directing him to wait in the day room and then opened the door to Caudle's cell. The sum of this evidence would permit a reasonable trier of fact to conclude that defendant provided the opportunity for Caudle to attack Rose at a time and place when defendant could ensure the assault was likely to occur with little or no interference from other guards.

As we have set out, the evidence above supports the trial court's refusal to strike the testimony of inmate Caudle (made on grounds there was no evidence that defendant had any dealings with Caudle or Caudle's cellmate) and the court's denial of defendant's motion to acquit (made on the grounds urged above of lack of corroboration of Caudle's testimony). (§ 1118.1.)

### B. *Possession of Alcohol in Prison*

Defendant was convicted of two counts of violating section 4573.8, which makes it a felony for "[a]ny person who knowingly has in his or her possession in any state prison . . . alcoholic beverages, without being authorized to possess the same by rules of the Department of Corrections,

rules of the prison . . . or by the specific authorization of the warden . . . ."3

Two cases decided in the early 1960's held that under a parallel provision, section 4573.6, which makes it unlawful to possess drugs in prison, the lack of authorization for such possession is an element of the crime rather than an affirmative defense. (*People v. Zepeda* (1964) 231 Cal.App.2d 18, 20-22 [41 Cal.Rptr. 571]; *People v. Ortiz* (1962) 200 Cal.App.2d 250, 257 [19 Cal.Rptr. 211].) More recent cases, however, have rejected that view concluding that authorization to possess drugs is an affirmative defense which defendant bears the burden to raise and prove. (*People v. Cardenas* (1997) 53 Cal.App.4th 240, 245-246 [61 Cal.Rptr.2d 583]; *People v. George* (1994) 30 Cal.App.4th 262, 275 [35 Cal.Rptr.2d 750].)

■ Defendant contends that because his duties as a correctional officer required him to seize and thus to have custody of contraband which includes alcohol, usually inmate-manufactured alcohol, the People were required to, but did not, prove that his possession of the alcohol was unauthorized. The legal issue defendant seeks to raise is irrelevant given the facts of his case.

There was considerable testimony about two types of alcohol at Pelican Bay; inmates and guards classified it generally as either commercially produced "street alcohol" or inmate-produced alcohol. Inmates made "pruno" by fermenting fruit and sugar and then, in some instances, distilled a clear alcohol from the pruno. Inmate Navarro testified that defendant supplied him with what the inmate believed to be vodka contained in a "see-through" bottle designed for baby oil. Navarro arrived at Pelican Bay in mid-August 1995 and was only on the "mainline" until early in September 1995. Inmate Branscum also testified that he received street alcohol from defendant who delivered it in pill bottles. The inmates' testimony was consistent with defendant's own account in a pretrial interview of his obtaining two small containers full of the clear alcohol being distilled by Indian inmates to reward his shot-callers, and naming Navarro and Branscum as recipients. Inmate Kenny Costa, another of the shot-callers, testified that defendant gave him street alcohol (which Costa identified as whiskey) while Costa and Branscum were in the kitchen one morning. At trial defendant denied giving alcohol to either inmate, though he conceded that on one occasion in his presence Branscum drank some clear alcohol from a coffee cup in the kitchen.

---

3The information alleged that defendant did "**POSSESS ALCOHOL IN PRISON in violation of Penal Code Sec. 4573.8, a felony**. During the period from Summer, 1994, through the end of September, 1995, Defendant willfully & unlawfully possessed alcohol in Pelican Bay State Prison."

Sometime in mid-May 1995, while defendant was in the control tower in the Secure Housing Unit (SHU), he was handed a cup of inmate-made alcohol by inmate "Cornfed" Schneider. Inmate Turner witnessed the transfer, but did not see whether defendant drank the inmate-made alcohol or not. According to Turner, defendant then "[c]ame back and said it was good." Some four days later, defendant warned Turner and Schneider that the pod would be searched in five minutes so they should conceal any contraband.

From the evidence of Navarro, Branscum and Costa, a trier of fact could reasonably conclude that defendant possessed street alcohol in prison. Thus, regardless of whether or not his duties as a correctional officer required defendant on occasion to seize contraband prison-made alcohol, his possession of street alcohol within the prison was unauthorized. Similarly, whatever authorization as a correctional officer defendant may have had to seize inmate-made alcohol, he was clearly not authorized to consume it, an inference which a reasonable trier of fact could draw from defendant's acceptance of a cup from inmate Schneider and defendant's subsequent comment on its quality.

Thus, quite apart from the considerable evidence that defendant brought alcohol-filled chocolates into the prison and gave them to various inmates, there was substantial evidence that defendant possessed alcohol in drinkable quantities which he then gave away or consumed. According to Sergeant Powers, because pruno was so common in the prison, an inmate would only be written up for it if he had several gallons, but if "you find a little . . . [a] milk carton of pruno, [you] just dump it in the toilet and flush it . . . ."

Nor, as defendant urges, can we infer from the fact that the jury did not convict defendant of two charged counts of bringing an alcoholic beverage into the prison (§ 4573.5) that it must necessarily have based defendant's conviction for possession upon his possessing confiscated inmate-made alcohol. There was testimony from an inmate who claimed to have seen at some unspecified date a bottle of whiskey in defendant's lunch pail. Officer Freitag testified that Garcia told her of taking alcohol into the prison concealed in his thermos or coffee mug in order to bribe information from inmates. In sum, there was evidence defendant brought in alcohol-filled chocolates and street alcohol which the jury found fell short of establishing two violations of bringing an alcoholic beverage into the prison. From the jury's inability to convict on those counts, however, neither law nor logic compels the conclusion that it therefore convicted defendant of possessing alcohol by relying solely upon his job-related possession of seized, contraband alcohol.

There is ample evidence supporting defendant's conviction of two counts of possession of alcohol.

## C. *Motion in Arrest of Judgment**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## D. *Destruction or Suppression of Evidence*

 Defendant maintains that he was deprived of his due process right to a fair trial in part because the district attorney and the Department of Corrections acted in concert to manufacture, destroy or suppress evidence.

The theory of the defense advanced at trial was that defendant, Sergeant Powers, and several other officers allied with Powers, became scapegoats of a concerted attempt to demonstrate that Pelican Bay was putting its affairs in order after a federal court decision found various inadequacies in the manner in which the institution was run.[4] Thus defense counsel argued to the jury that early in 1995, once the *Madrid* decision was issued, a longtime enemy of Sergeant Powers, Captain Dan Smith as head of the internal security unit undertook first to demote and then to create false charges against Powers and his allies, including defendant.

On appeal defendant reiterates these allegations, but now expands them to allege that the prosecutor participated in that conduct "[b]y illegally confining numerous inmates (at least 21 in number) in administrative segregation for indefinite periods or placing them in housing situations where their lives were in serious jeopardy, making their release from solitary or their move to safe housing dependent upon the inmate's willingness to adopt and recite false stories alleging misconduct on the part of Sgt. Powers, Defendant and the other targets of their 'investigation'. As a further inducement to the inmate hostages, Smith with [the prosecutor's] participation offered to purge disciplinary files for inmates to improve their chances of lower custody levels, transfers to other institutions more amenable to the inmates and in the case of recalcitrant inmates, the administration of a physical beating and the presentation of a scripted statement." These are serious allegations indeed, and we question whether even the most charitable reading of the record would support that such events occurred or that the prosecutor participated in them. Certainly defendant makes no reference to portions of the record which support the theory he advanced in argument or the more elaborated form of that theory he presents in his opening brief quoted above.

---

*See footnote, *ante*, page 316.

[4]The case as described to the jury was a prisoners' civil-rights class action, *Madrid v. Gomez* (N.D.Cal. 1995) 889 F.Supp. 1146, challenging "a broad range of conditions and practices that intimately affect almost every facet of [the inmate's] prison life." The decision filed January 10, 1995, apparently imposed a monitor to oversee correction of certain practices. Captain Dan Smith was the *Madrid* monitor.

Relying upon *Brady v. Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215] (*Brady*), which holds that the suppression by the prosecution of evidence denies a defendant due process where the evidence is material either to guilt or to punishment, defendant contends that the sum of prosecutorial misconduct here compels reversal of his conviction. He argues that the prosecutor, especially given his integral part in the investigation, had a duty to find and disclose evidence collected by every government entity investigating Pelican Bay, defendant and Powers, or other former or present Pelican Bay correctional officers.

 It is undisputed that a prosecutor has an ongoing duty to disclose material evidence favorable to the defendant regardless of whether the evidence is requested in discovery. (*United States v. Agurs* (1976) 427 U.S. 97, 107 [96 S.Ct. 2392, 2399, 49 L.Ed.2d 342].) Evidence is material in this context if, had it been disclosed, there is a reasonable probability that the outcome of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome of the trial. (*United States v. Bagley* (1985) 473 U.S. 667, 674 [105 S.Ct. 3375, 3379, 87 L.Ed.2d 481].)

1. *Investigation of Coconspirators**

. . . . . . . . . . . . . . .

2. *Knowles Investigation*

 Defendant sought discovery of another investigation undertaken in the spring and summer of 1997 by Warden Knowles (High Desert State Prison) and Captain Palmer (Folsom State Prison). On October 23, 1997, defense counsel was provided in discovery a box of interview tapes which included the previously undisclosed Knowles-Palmer materials.

Defendant contends that statements made by the prosecutor, based upon representations made to him by Lieutenant Ortiz, were designed to misrepresent the content of the Knowles-Palmer report and thus amount to suppression of *Brady* material. In a telephone call the prosecutor had asked Ortiz if the Knowles-Palmer report made mention of defendant, Powers or Alvarado. Relying upon his memory, Ortiz told the prosecutor over the phone, and confirmed his phone message with a fax, that he had reviewed the report and "I can assure you that none of the above mentioned individuals are mentioned in the report." In fact, one of the subjects of the Knowles-Palmer investigation was Alvarado, and defendant figures prominently in the accounts of various individuals interviewed for the report.

---

*See footnote, *ante*, page 316.

The Knowles-Palmer report was admitted into evidence at trial, and defense counsel argued to the jury that the investigation which led to the report was yet more evidence of a concerted action to retaliate against Alvarado, defendant and the associates of Powers. Defense counsel also argued that what turned out to be a false representation about the contents of the report by Ortiz was additional evidence of an attempt by the prosecutor to frame defendant.

The trial court found that the delayed production of the Knowles-Palmer report "caused no prejudice to the Defense." (*People v. Pinholster* (1992) 1 Cal.4th 865, 941 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Defendant does not contend that the trial court's finding of no prejudice was erroneous. Likewise, we cannot say that the delayed disclosure of the Knowles-Palmer report amounted to suppression of material evidence denying defendant a fair trial. (*United States v. Bagley, supra,* 473 U.S. 667, 678 [105 S.Ct. 3375, 3381-3382].)

3. *Ortiz's Investigative Notes*

Defendant makes much of the fact that Captain Ortiz, an investigator working for the Director of Corrections who took over an investigation of defendant which had begun with the internal affairs unit at Pelican Bay, testified that after preparing his report he destroyed his investigative notes as was his custom. Defendant argues that such destruction was contrary to Pelican Bay policy, and therefore it can be inferred that he destroyed the notes in a deliberate attempt to frustrate their discovery by the defense.

To the extent defendant contends the state had an obligation to preserve the investigatory notes as evidence that would be expected to play a significant role in defendant's defense, the test is whether defendant would be able to obtain comparable evidence by other reasonably available means. (*California v. Trombetta* (1984) 467 U.S. 479, 488-489 [104 S.Ct. 2528, 2533-2534, 81 L.Ed.2d 413]; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1055 [17 Cal.Rptr.2d 174, 846 P.2d 756].) Here, Ortiz testified that his investigative notes were either incorporated into his reports or consisted of photocopies of documents generated by Pelican Bay. The possibility that information might have been helpful to the defense does not make it material in the constitutional sense. (*People v. Fauber* (1992) 2 Cal.4th 792, 829 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *United States v. Agurs, supra,* 427 U.S. at pp. 109-110 [96 S.Ct. at pp. 2400-2401].) Here too we fail to perceive any prejudice to defendant from destroyed materials, which apparently were otherwise available to him.

### E. Denial of Witnesses Requested by the Defense

█ Defendant cites as error the trial court's refusal to allow him to call either inmate Andrews or the prosecutor as witnesses. Lacking any citation to the ruling complained of as to Andrews or authority for the proposition that such a ruling was erroneous, we do not address the claim as to inmate Andrews. (*Oldenkott v. American Electric, Inc.* (1971) 14 Cal.App.3d 198, 207 [92 Cal.Rptr. 127].)

Defendant initially sought to call the prosecutor as a percipient witness because he was present at interviews conducted of various witnesses. Defendant was apparently arguing that the prosecutor was acting as an investigating police agent when he conducted a telephone interview of Officer Marci Prater, and therefore defendant argued the prosecutor was an indispensable witness. Subsequently, defendant filed notice on October 22, 1997, of his intention to call the prosecutor as a witness in order to examine the prosecutor as to his failure to produce discovery relating to Officer Freitag, and interview tapes, files and witness statements given to Ortiz. Defendant, again without an accurate citation to the record, contends that the court refused to permit the defense to call the prosecutor, "[h]olding that what was sought by Defendant could be obtained from other sources."

Assuming that the court did rule on the motion and precluded the defense from calling the prosecutor, we nonetheless perceive no error. Only in extraordinary circumstances should an attorney in an action be called as a witness, and before the attorney is called, defendant has an obligation to demonstrate that there is no other source for the evidence he seeks. (*People v. Guerrero* (1975) 47 Cal.App.3d 441, 445 [120 Cal.Rptr. 732]; *United States v. Prantil* (9th Cir. 1985) 764 F.2d 548, 551.)

The interview to which the defense objected was of Officer Prater and was conducted by the prosecutor in the presence of Investigator Barton; it was taped and the tape was provided to the defense. Prater was not called by either side at trial. In these circumstances we agree with the People that defendant's request to call the prosecutor as a witness was supported neither by extraordinary circumstances nor by an inability to obtain the same information from another source—Investigator Barton.

### F. Denial of Items Sought in Discovery

#### 1. Cellmate Assignment History*

. . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 316.

## 2. *Memorandum of Officer Alvarado*

■ On December 16, 1997, the court heard argument and ruled on a motion filed the previous day to strike in toto the testimony of inmates Patin, Figueroa, and Herrera who had testified among other matters to the attack Figueroa committed on Herrera on January 18, 1995. Defendant was charged with that assault in count 7 of the information. The defense also sought an in limine ruling precluding the People from referring to, or relying upon, the testimony of the three inmates. The defense contended that reports, allegedly prepared by Officer Alvarado in which he explored the role of the Mexican Mafia in the attack on Herrera, had been intentionally withheld by the People.

The basis for the motion was a document recently acquired by the defense which suggested that Figueroa's motive for the attack upon Herrera was not an attack on a child molester instigated by defendant, but in fact a gang-related hit on Herrera who had allegedly "disrespected" a leader of the Mexican Mafia. Memoranda and reports relating to an interview of Figueroa and a message from a confidential inmate informant were introduced by the defense and sealed.

The gravamen of the information was to impeach Figueroa and Patin as to the reason for the assault on Herrera. The court found that since there was ample time to call all three inmate witnesses—indeed, two were still in county jail having not yet been returned to their prisons—that all the defense needed to do was put them on the stand to elicit the impeaching testimony and the credibility of the witnesses could be determined by the jury. Thus, in the court's view the defendant would suffer no prejudice by the late appearance of the documents. The court further addressed the issue of whether the memoranda and reports produced by the defense had been intentionally suppressed by the People. Finding that numerous investigations were involved at Pelican Bay and that an investigation of the Mexican Mafia did not necessarily directly impinge upon the investigation of defendant, the court concluded that the material had not been intentionally withheld. The motion was denied in its entirety.

It is unclear exactly to what defendant objects. He chose not to call the inmate witnesses to the stand. He does assert that "[w]ithout the memorandum of the interview of Herrera prepared by Officer Alvarado shortly after the attack," his examination of Herrera would have been futile. If that was defendant's position, it would have been well for the defense to have articulated it to the court at the time it heard and ruled on the motion. Having failed to particularly request discovery of an identifiable document, defendant should not now be heard to complain of the court's lack of prescience.

*(People v. Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event defendant can scarcely demonstrate that the Alvarado memorandum was material and that there was a reasonable probability that, had it been disclosed, he would have obtained a different result. (*United States v. Bagley, supra,* 473 U.S. at pp. 682-683 [105 S.Ct. at pp. 3383-3384].) Here defendant obtained the best possible result because the jury deadlocked on count 7, which was the assault charge based upon the attack on Herrera. (*Ibid.*)

### G. *Erroneously Admitted Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### H. *Cumulative Prejudice*

Defendant's final contention on appeal seems to be a complaint that various acts of what he terms prosecutorial misconduct went unsanctioned by the trial court which declined to award him either sanctions in the form of an award of attorney fees and costs or in the form of rulings excluding evidence and witnesses or dismissing the charges. Having failed to find the misconduct of which defendant complains, we likewise make no monetary sanctions award to defendant. Moreover, we are quite unable to perceive the cumulative prejudice he contends denied him a fair trial. (See *People v. Kipp* (1998) 18 Cal.4th 349, 383 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

### III. *Disposition*

The judgment is affirmed.

Hanlon, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied November 15, 2000.

---

*See footnote, *ante*, page 316.