Filed 10/31/13  P. v. Brambila CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046681 |
| v. | (Super. Ct. No. 07CF4182) |
| GUILLERMO JUNIOR BRAMBILA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Guillermo Junior Brambila of conspiracy to commit murder (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a); all further statutory references are to this code unless otherwise indicated; count 1), attempted murder (§§ 664, subd. (a), 187, subd. (a); count 2), murder (§ 187, subd. (a); count 4), and two counts of street terrorism (§ 186.22, subd. (a); counts 3 & 5). It found true defendant committed counts 1, 2 and 4 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), vicariously intentionally discharged a firearm during the conspiracy alleged in count 1 (§ 12022.53, subds. (c), (e)(1)), and that the intentional discharge of a firearm by a principal alleged in count 4 resulted in death (§ 12022.53, subd. (d)). It further found true the special circumstance allegation that defendant committed count 4 while an active participant in a criminal street gang and to further the gang's activities. (§ 190.2, subd. (a)(22).) The court sentenced defendant to life in prison without the possibility of parole and further imposed an indeterminate term of 25 years to life, plus 20 years.

Defendant contends substantial evidence does not demonstrate he entered an agreement to commit murder or his convictions for attempted murder and street terrorism (counts 1-3). He further argues prejudicial testimony by the gang expert requires reversal of his convictions for murder and street terrorism (counts 4 and 5) and that all his convictions should be reversed because he received ineffective assistance when his counsel failed to object to prosecutorial misconduct. Although he also claimed the gun enhancement attached to the conspiracy count should be reversed because it was not part of the agreement to commit the crime that is the gravamen of the conspiracy, he has withdrawn the argument. Finding no prejudicial error, we affirm the judgment.

FACTS

In 2007, defendant and Jonathan Dizon, both members of the Delhi criminal street gang, were hanging out on a street corner when a car drove by containing

2

what they believed to be members of Alleyboys, a rival gang. Defendant handed Dizon, a newer member of Delhi, a gun and told him to go to the car and shoot. Dizon walked over to the car and was killed when shots were exchanged. Defendant retrieved the gun, which appeared to have jammed after firing one shot, and disposed of it at some point.

Either that night or the next day, defendant divulged to his friend Truong Ly that he had handed Dizon a gun and yelled "go shoot at the car," "[d]on't even hit them up, just light them up," meaning open fire without asking about gang affiliation. Ly knew defendant and Dizon were involved with Delhi, with Dizon "[j]ust starting out in" the gang. Defendant also disclosed to Brittney Ehrman, his child's mother, he had told Dizon to go to the car and to "shoot, shoot, they got a gun."

At trial, Detective Julian Rodriguez testified that Ly had informed him "defendant was telling . . . Dizon to shoot at the car, and for whatever reason he didn't. Instead, he crouched down and began exchanging words with the occupants of the vehicle." Additionally, Ly reported defendant told him he saw Dizon "walk up to the vehicle, exchange words with the occupants, fire a shot, and then shots rang out of the vehicle[,] striking him." When asked if Ly indicated if Dizon fired into the car before he was shot, Rodriguez responded, "He didn't articulate if the shot went into the vehicle. Just that a shot was fired by . . . Dizon. And that shots came out of the vehicle."

About two weeks later, 15-year-old Eric Guerrero, who had the appearance of a gang member with baggie clothes and shaved head, was shot and killed. Two days after Guerrero was shot, defendant fled from a vehicle after it was stopped by police. During the foot pursuit, defendant threw a gun into the bushes and escaped over a chain-link fence topped with barbed wire. The officer retraced his steps and found the gun, which was later determined to be the one that fired the bullet that killed Guerrero.

Upon reading about Guerrero's shooting, Ehrman asked defendant if he knew anything about it. Defendant initially said he did not, but later told her he was the driver, not the shooter. When she asked about the cuts on his hands, defendant said he

3

received them when he jumped a fence while being chased by police. He said he was running because he had a gun, which he hid in some bushes. The cuts on his hands were in the process of healing when he was arrested by police a few weeks later.

## DISCUSSION

*1. Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support his convictions for conspiracy to commit murder, attempted murder or street terrorism. In reviewing sufficiency of the evidence claims, we do not reweigh the evidence or assess the credibility of witnesses (*People v. Albillar* (2010) 51 Cal.4th 47, 60), but examine the entire record and draw all reasonable inferences from the record in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt (*People v. Streeter* (2012) 54 Cal.4th 205, 241). We conclude there is.

*a. Conspiracy to Commit Murder*

Defendant argues his conviction for conspiracy to commit murder must be reversed because there was insufficient evidence to prove that he and Dizon had an agreement to commit murder. We disagree.

A conspiracy is an agreement by two or more persons to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy. (*People v. Jurado* (2006) 38 Cal.4th 72, 120.) "To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" (*People v. Vu* (2006) 143

4

Cal.App.4th 1009, 1025.) "While mere association does not prove a criminal conspiracy [citation], common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (*People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20-21.) Thus, "'a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

Here, the record contains sufficient evidence defendant and Dizon expressly or tacitly reached an agreement to commit murder. Both were Delhi gang members who saw a car they suspected contained Alleyboys, Delhi's "brutal" and "main rival" between whom the prosecution's gang expert testified there was a "bloody feud . . . with a lot of shootings, murders back and forth." Defendant, a more senior member of the gang, gave Dizon, a relatively new member, a gun and told him to approach the car and shoot, which Dizon ultimately did, although he first leaned over to talk to the car's occupants. After Dizon was shot, defendant retrieved the gun, which appeared to have jammed after firing one shot, and disposed of it.

Defendant contends Ly's testimony that defendant yelled at Dizon not to confront the car's occupants but to just shoot shows there was no agreement to commit murder because (1) defendant was "telling Dizon what to do *after* he already handed Dizon the gun and as Dizon continued to walk toward the car" and (2) "Dizon did not do what [defendant] told him to do" (italics omitted) but instead first leaned down to talk to the occupants of the car. We are not persuaded. Ly also testified defendant had told Dizon "[t]o go shoot at the car" when he handed him the gun. Dizon then took the gun and approached the car. A jury could reasonably find from these facts the agreement to commit murder was made when the gun changed hands. That Dizon did not immediately shoot at the car does not undermine the agreement as defendant argues. The agreement was to commit murder, not when to shoot at the car. Even if defendant's instructions to just shoot did not come until Dizon was walking toward the car, a reasonable jury could

5

find this was after the agreement to commit murder had been made. "[W]hile the jury must acquit [a defendant of conspiracy] if the circumstantial evidence is capable of two interpretations, one suggesting guilt and one suggesting innocence, once the jury concludes defendant is guilty that determination is upheld on appeal providing that the circumstances reasonably justify the jury's determination." (*People v. Garcia* (2000) 84 Cal.App.4th 316, 323.) Such circumstances exist here.

### b. Attempted Murder

In count 2, defendant was convicted of aiding and abetting Dizon in attempting to commit murder. Defendant asserts the crime of attempted murder requires proof Dizon intentionally fired the gun and insufficient evidence of that was presented. Although evidence showed the gun defendant took from Dizon's hand after he was shot had been fired once, defendant argues that since the one eyewitness to the shooting who testified at trial, Carlo Calderon, "did not see Dizon holding the gun before he was shot, and therefore never saw [him] raise and/or aim the gun, the logical inference is that his hand clenched when he was shot, discharging a bullet in the process." But the law does not required Dizon to have intentionally fired the gun.

Rather, to establish attempted murder, "there must be sufficient evidence of the intent to commit the murder plus a direct but ineffectual act towards its commission. [Citation.] 'Preparation alone is not enough, there must be some appreciable fragment of the crime committed[ ] [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter . . . .'" (*People v. Morales* (1992) 5 Cal.App.4th 917, 925.)

Defendant essentially claims Dizon's conduct never passed beyond mere preparation. But "where the design of the accused [or his accomplice] is clearly shown, slight acts done in furtherance of the crime will constitute an attempt [citation]; it is not necessary that the overt act be the last possible step prior to the commission of the

6

crime." (*People v. Morales*, *supra*, 5 Cal.App.4th at p. 926.)  Here, Dizon took the gun from defendant, who told him to approach the car containing what they believed to be rival gang members and shoot.  Dizon complied and approached the car with the gun in his hand.  The jury could have reasonably determined Dizon, as a newer member of the gang being watched by a more senior one, would have completed the murder had the gun he was holding not jammed and he not been shot first.

### c.  Street Terrorism

Because substantial evidence support defendant's convictions for conspiracy to commit murder (count 1) and attempted murder (count 2), his claim his conviction for street terrorism should be reversed due to the failure to prove either of these predicate acts fails.

## 2.  Gang Expert's Testimony

Defendant contends the court erred by allowing the prosecution's gang expert, Detective David Rondou, to relate "prejudicial testimonial hearsay" in violation of *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*) and give non-hypothetical opinions on the ultimate issues of the case.  We conclude otherwise.

### a.  Testimonial Hearsay

Rondou, a gang expert who has testified many times about the Delhi gang, explained the importance of respect to a gang and that if a gang failed to retaliate or protect its claimed area and members after being wronged, it is deemed weak and loses respect.  Following up on this, the prosecutor asked about the Guerrero shooting: "Would that be the type of retaliation that you were talking about, . . . Dizon is murdered, Delhi is looking to retaliate for that murder?"  Rondou answered, "Correct.  And talking

7

to other Delhi gang members after that happened that's exactly what the Guerrero murder was. It was in retaliation for [Dizon] being shot."

Defendant asserts Rondou's response constituted "testimonial hearsay" that violated his Sixth Amendment rights to confrontation as explained in *Crawford* because his statements about his conversations with "other Delhi gang members "were presented for their truth, as direct evidence of who killed . . . Guerrero and why . . ., a crucial fact that would have been based on pure speculation without the hearsay." But the record does not allow us to determine whether the gang members' statements to Rondou were "testimonial."

*Crawford* held that under the confrontation clause, "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness.]" (*Crawford*, 541 U.S. at p. 59, fn. omitted) but left "for another day any effort to spell out a comprehensive definition of 'testimonial'" (*id.* at p. 68, fn. omitted). "[T]he United States Supreme Court has still not agreed upon a definition . . . [of 'testimonial' although it has] decided that, whatever the definition, a core class of formalized 'testimonial' hearsay includes prior preliminary hearing or grand jury testimony ([*id.*] at pp. 51, 68 . . . ); statements made in response to police interrogations if there is no ongoing emergency and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution (*Davis v. Washington* (2006) 547 U.S. 813, 822 [126 S.Ct. 2266, 165 L.Ed.2d 224]; *Michigan v. Bryant* (2011) 562 U.S. ___, 131 S.Ct. 1143, 1157 [179 L.Ed.2d 93]); and sworn affidavits that are admitted in lieu of live testimony (*Melendez-Diaz* [*v. Massachusetts* (2009) 557 U.S. 305, 310] [129 S.Ct. 2527, 174 L.Ed.2d 314] [forensic analyst's affidavit within core class]). Beyond this list, a majority of the justices of the United States Supreme Court have never agreed upon a formulation for determining which

out-of-court statements are 'testimonial.'" (*People v. Holmes* (2012) 212 Cal.App.4th 431, 437.)

The California Supreme Court recently considered confrontation issues in several cases in which it applied a fairly straightforward rule. In the majority opinions in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), both of which involved witnesses who testified about technical reports that they did not prepare, the court expresses the view that there are two criteria that must be satisfied to invoke the confrontation clause: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Dungo*, at p. 619; *Lopez*, at pp. 581-582.) "It is now settled in California that a statement is not testimonial unless both criteria are met." (*People v. Holmes*, *supra*, 212 Cal.App.4th at p. 438.) Although there may be questions about the formula expressed by the majority (see dissent of Justice Liu in *Lopez*, at pp. 590-607, and Justices Corrigan and Liu in *Dungo*, at pp. 633-649), *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, requires us to follow the law as stated by a majority of our high court.

The record here does not establish the circumstances under which Rondou talked "to other Delhi gang members." It contains no evidence about who or how many persons Rondou talked to, when he talked to them, what was said, or the circumstances under which the conversation or conversations took place. As the Attorney General notes, for all we know, "the statements upon which . . . Rondou relied were the product of consensual encounters discussing recent events in the neighborhood." To this end, Rondou testified he talked to gang members "every day" and that he has "probably talk[ed] to well over 10,000 gang members in his career, regarding . . . gang subculture, the issues of respect, the importance of guns, the issues of disrespect[, w]hat it means to be disrespected, how gangs flourish, [and] how they get trampled over. The in's and

9

out's basically the playbook for gangsters." Because the record does not reflect whether the gang members' statements to Rondou were made with the requisite "formality or solemnity" (*Dungo*, *supra*, 55 Cal.4th at p. 619), defendant failed to establish the first element of a testimonial statement. Under the current state of the law, the statements made by gang members to Rondou cannot be deemed testimonial.

### b. Improper Expert Opinion

Defendant argues his convictions should be reversed because Rondou usurped the jury's role by rendering improper opinions on how a particular crime was committed for the benefit of and in association with the gang, rather than giving his opinions in response to hypothetical questions. We disagree.

Expert testimony regarding the culture, habits, and psychology of gangs is generally permissible because these subjects are """"sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."""" (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656 (*Killebrew*), disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*).) Thus, an expert may properly testify about, inter alia, "motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], [and] rivalries between gangs . . . ." (*Killebrew*, at p. 657.)

"'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth."'" (*Vang*, *supra*, 52 Cal.4th at p. 1045.) Such "questions must be rooted in the evidence of the case being tried, not some other case" (*id.* at p. 1046) and "[t]he questioner is not required to disguise the fact the questions are based on that evidence" (*id.* at p. 1041). This is because hypothetical questions not based on the evidence are irrelevant, and expert testimony not based on the evidence will not assist the trier of fact. Thus "hypothetical questions [must] be based on what the evidence showed [this] defendant[] did, not what

10

someone else might have done." (*Id*. at p. 1046.) Although a difference exists "'between testifying about specific persons and about hypothetical persons'" (*id*. at p. 1047), "expert testimony regarding whether the *specific* defendants acted for a gang reason" is inadmissible not because "such testimony might embrace the ultimate issue in the case" but for the same reason a witness may not opine on a defendant's guilt, i.e., it does not assist the jury, which is """"as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt"""" (*id*. at pp. 1048, 1052).

Here, the format of the questions and answers leave something to be desired, with the prosecutor stating the facts of the case with the names of the participants rather than in a hypothetical format. The prosecutor asked if Rondou was familiar with the facts of Dizon's shooting and witness testimony that defendant handed Dizon a gun when potential rivals approached. Rondou confirmed he was. When questioned "how . . . that particular type of crime benefit Delhi[,]" Rondou stated, "The facts of this case are you've got a potentially older established gang member in [defendant], and a younger coming up gang member in . . . Dizon. . . . And under these scenarios or these circumstances, which I've investigated a ton of them, it's an older guy saying go handle that. Let's see how you do. And that's what these facts look like. He is handed a gun and said go challenge these guys. And find out where they're from. He walks up and hits up people with a gun in his hand."

After the court overruled an objection that the response was nonresponsive and went to the ultimate issue, Rondou described how the crime benefitted the gang and was committed in association with another gang member: "when you have multiple Delhi gang members, one of them arming themselves from another to go potentially shoot and kill somebody, you have them working in concert with each other, which is done in association with. [¶] The other part of that is it's going to benefit Delhi, that . . . if they see somebody coming around that they don't like or trust, they're going to

11

arm themselves and deal with it.  Not only does the status of the members itself that are doing this, but the gang as a whole is going to get credit for it."

The prosecutor later asked if the Guerrero shooting was "the type of retaliation that [Rondou talked about earlier], . . . Dizon is murdered, Delhi is looking to retaliate for that murder?"  Rondou responded, "Correct.  And talking to other Delhi gang members after that happened that's exactly what the Guerrero murd[er] was.  It was in retaliation for [Dizon] being shot."  Rondou further explained that a retaliation shooting benefits Delhi because "it sends a message to the gang subculture if you shoot one of us, we will shoot you.  And the respect level with Delhi is going to be elevated every time."

Defendant contends these questions and answers impermissibly told the jury what he, "Dizon, and Delhi gang members did, thought, and intended" "and that they were 'working in concert with each other' to benef[i]t the gang."  But as to the Dizon shooting, Rondou was not asked about what defendant and Dizon *did* but only if he was familiar with the facts and witness testimony, which Rondou confirmed he was.  Nor was he asked about their *subjective* motivations, i.e., what they *thought or intended*, but only how the *actions* of one gang member handing a gun to another member and telling him to shoot at a car containing what they believed to be rival gang members had the *objective* effect of benefitting the gang and qualified as an act committed in association with another gang member.  Rondou's answer was that their *actions* elevated their status and that of the gang and were committed in association with each other.

The fact Rondou's opinion was not presented in a strictly hypothetical format did not necessarily make it inadmissible.  *Vang* did not so hold and in fact stated, albeit in dicta, "that in some circumstances, expert testimony regarding the specific defendants might be proper."  (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4 [noting *People v. Valdez* (1997) 58 Cal.App.4th 494, 507, which found the trial court had discretion to admit expert testimony that crimes were committed for the benefit of gangs in a non-hypothetical format, was cited with approval in *People v. Prince* (2007) 40 Cal.4th 1179,

12

1227.) *Valdez* relied on the rules giving discretion to a trial court to determine whether a particular expert opinion was "tantamount to an opinion of guilt." (*Valdez*, at p. 509.) Among other things, the expert's opinion in *Valdez* was found to be permissible because it was partially probative of only one element of the gang enhancement allegation, and thus, it was not unduly directive to the jury. (*Ibid*.; see also *People v. Torres* (1995) 33 Cal.App.4th 37, 47 & fn. 3 ["[t]here are some crimes a jury could not determine had occurred without the assistance of expert opinion as to an *element* of the crime" such as intent and in those cases, "expert testimony is admissible"].)

The same applies here with respect to Rondou's testimony defendant and Dizon's actions were committed for the benefit of the gang and in association with or "in concert with each other," which go to elements of the street terrorism count under section 186.22, subdivision (a) charged in count 3 and the gang enhancements under section 186.22, subdivision (b) attached to counts 1 (conspiracy to commit a crime) and 2 (attempted murder). (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 ["section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member"]; *People v. Albillar, supra*, 51 Cal.4th at pp. 64-67 [section 186.22, subdivision (b) requires felony committed for benefit of or in association with a criminal street gang, and that the defendant promote, further or assist criminal conduct by gang member].) As such, his "opinion was not tantamount to an opinion of guilt or . . . that the enhancement allegation[s] w[ere] true, for there were other elements to the allegation[s] that had to be proved." (*Valdez, supra*, 58 Cal.App.4th at p. 509.)

By contrast, Rondou's opinion the Guerrero shooting was an example of the retaliation to which he had previously referred and that it was done in retaliation for the Dizon murder relates to the *subjective* motivation of the gang, which had the *objective* effects of benefitting the gang by sending a message there will be consequences if one of its gang members is shot by a rival gang member and elevating the gang's status. Even

13

so, the motivation for a certain crime, whether it was done in retaliation, and how it benefits a gang are proper areas upon which an expert may testify (*Killebrew*, *supra*, 103 Cal.App.4th at p. 657, fns. omitted) and go only to an element of murder (count 4), i.e., whether it was done with malice aforethought, its attached gang enhancement and special circumstance allegations (§§ 186.22, subd. (b); 190.2, subd. (a)(22) [mandating sentence of life without possibility of parole where victim intentionally killed "while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang"]), and street terrorism under section 186.22, subdivision (a) (count 5). Because other elements needed to be established, Rondou's testimony was not equivalent to an opinion defendant was guilty of the crimes or enhancements charged and the court did not err by admitting it. (*Valdez*, *supra*, 58 Cal.App.4th at p. 509.)

Moreover, the reason expert testimony regarding a specific defendant is not admissible is because it does not aid the jury. (*Vang*, *supra*, 52 Cal.4th at pp. 1048, 1052.) In other words, an expert's opinion is not admissible when it merely "'consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.'" (*Valdez*, *supra*, 58 Cal.App.4th at p. 506.) Here, Rondou was properly allowed to explain how the crimes benefited the gang and the possible motivation because these are areas "'"sufficiently beyond common experience"'" that his opinion may be deemed helpful to a jury. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 656; see also *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513 [expert may testify whether and how a crime benefited or promoted gang].) The prosecutor's questions "were directed to helping the jury determine whether [this] defendant[], not someone else, committed a crime for a gang purpose. Disguising this fact would have only confused the jury" (*Vang*, at p. 1046), which was left to determine whether, based on the totality of the evidence, defendant committed the charged offenses and enhancements. Rondou's "conclusion . . . did not bind the jury, nor would [his] testimony be understood

14

as essentially directing a verdict" any more than any other expert opinion involving an ultimate issue. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1227.)

Even assuming error, it was not reasonably probable an outcome more favorable to defendant would have resulted in the absence of the subject testimony. (*People v. Clark* (2011) 52 Cal.4th 856, 940-941 [error in admission of prosecution's expert witness testimony subject to *Watson* standard of harmless error]; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Had hypotheticals been used, they would have been required to mirror or closely track the facts of this case in order to be relevant and of assistance to the jury. (*Vang*, *supra*, 52 Cal.4th at pp. 1046, 1048 [hypothetical questions must be based on evidence showing what the defendant, not someone else, did].) The only difference in that event would have been questions and answers omitting the participants' names but the evidence of which defendant complains likely still would have been presented and the jury would have known the hypothetical was referring to the facts of this case. Thus, though we do not condone the use of the parties' names when asking and answering the questions, we are not persuaded a different result would have occurred.

Moreover, the jury was instructed with CALCRIM No. 332 on how to evaluate expert testimony, including that it was up to them to establish if the opinion was accurate or true, "whether information on which the expert relied was true and accurate," and to disregard any opinion they found "unbelievable, unreasonable, or unsupported by the evidence." We presume the jury followed this instruction where there is no indication to the contrary. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

Defendant maintains Rondou's opinions as to the Dizon shooting were prejudicial because he repeated Ly's testimony that defendant handed Dizon a gun "as if it was the undisputed fact of the matter," agreed with the prosecutor's implication multiple witnesses testified defendant had handed Dizon a gun (due to the use of the plural form of "witness") even though only Ly so testified, and was the only one who testified defendant sent Dizon to "challenge these guys and find out where they're from"

15

and that the two were "working in concert with each other." He also contends it was prejudicial error for Rondou to testify Guerrero was shot in retaliation for Dizon's shooting because it "connect[ed] the dots for [the jurors]" when the evidence supporting the inference was "not strong." But there is no indication the jury did not comply with its responsibility to decide if these statements were credible, correct, or supported by the evidence. Absent that, we presume the jury followed the court's instruction.

*3. Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Defendant argues the prosecutor committed prejudicial misconduct during closing argument by using a puzzle analogy with missing pieces to explain reasonable doubt, a practice found to be misconduct because it "convey[s] an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt." (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268 (*Katzenberger*).) He acknowledges his attorney did not object at the time, forfeiting the issue and asserts he received ineffective assistance. To prevail, defendant had to demonstrate counsel's representation fell below an objective standard of reasonableness and a reasonable probability exists that, but for the deficient performance, the result would have been different. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].) Where, as here, prejudice is not shown, the contention may be rejected "without determining whether counsel's performance was deficient." (*People v. Mayfield* (1997) 14 Cal.4th 668, 784.)

Defendant relies on a single brief portion of the prosecutor's closing argument. But "'arguments of counsel "generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law."'" (*Katzenberger*, *supra*, 178 Cal.App.4th at p. 1268.)

16

Moreover, the trial court instructed the jury with CALCRIM No. 200, which provides in relevant part: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The prosecutor confirmed the jurors should "follow the law the judge [will give] you." The jury was further instructed with CALCRIM No. 220 that proof beyond a reasonable doubt "is proof that leaves you with an abiding conviction that the charge is true." "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Osband* (1996) 13 Cal.4th 622, 717; see *Katzenberger*, *supra*, 178 Cal.App.4th at p. 1269 [presuming jury relied on court's jury instruction correctly defining reasonable doubt].) "Given the instructions provided here, we discern no reasonable likelihood [citation] that the prosecutor's statements would have misled the jury . . . ." (*People v. Mayfield*, *supra*, 5 Cal.4th at p. 179.)

Defendant maintains the reasonable doubt instruction is insufficient because the misconduct "does not run counter to the definition of reasonable doubt in CALCRIM No. 220[ but rather] 'helps explain' the concept of 'proof beyond a reasonable doubt' and how to arrive at an 'abiding conviction' in a way that is easier for jurors to understand than the vague jury instruction." According to defendant, that "means many jurors are likely to rely on it as a plain-language interpretation that stands in for the more obscure language of the actual instruction." The contention is unsupported and goes against the fundamental assumption "that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) We thus reject it.

Moreover, defendant claims the prosecutor used the puzzle analogy "in exactly the way the prosecutor in *Katzenberger* did." *Katzenberger* found no prejudice in

17

large part because of the court's proper instructions to the jury. (*Katzenerger*, *supra*, 178 Cal.App.4th at pp. 1268-1269.) Any misconduct here was nonprejudicial for the same reason and defendant's counsel did not render ineffective assistance by failing to object.

*4. Cumulative Error*

Defendant lastly asserts the alleged errors cumulatively compromised his due process rights and were prejudicial. "'We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236.)

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

THOMPSON, J.

18