Filed 1/7/15  P. v. Montoya CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243042 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA066801) |
| v. | |
| LETICIA MARIE MONTOYA, et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Beverly R. O'Connell, Judge.  Modified and affirmed.

Sara H. Ruddy, under appointment by the Court of Appeal, for Defendant and Appellant Leticia Montoya.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant Sergio Flores.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Joseph P. Lee, and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants Leticia Montoya and Sergio Flores were each charged with one count of willful, deliberate and premeditated murder (Pen. Code, § 187 (count 1)),[1] and one count of shooting from a motor vehicle (former §12034, subd. (c) (count 3)).[2] In addition, Flores was charged with one count of unlawful firearm activity (former § 12021, subd. (c)(1) (count 2)).[3] Firearm allegations were included in counts 1 and 2 (§§ 12022.53, subds. (b), (c), (d), (e)(1)), and criminal street gang allegations were included in counts 1 and 3 (§ 186.22, subd. (b)(1)(c)). In a joint trial to separate juries, defendants were convicted on all counts, with sustained findings on the firearm and criminal street gang allegations.[4] Each defendant appeals from the judgment. We modify the judgment as to custody credits. The judgment, as modified, is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

At about 2:00 a.m. on December 28, 2008, Kevin Montenegro, Nick Perez, and Abraham Guerrero were standing outside Guerrero's house on Correnti Street in Pacoima. A white car drove by the house, made a U-turn, and returned with its headlights off. A rifle was protruding from the front passenger window. The car stopped

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] Former section 12034 is presently found at section 26100, subdivision (c). The statute provides: "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony punishable by imprisonment in state prison for three, five, or seven years."

[3] Former section 12021, subdivision (c)(1) is presently found at section 29805.

[4] Montoya also was found to have suffered a prior prison term. She received a sentence of 51 years to life, consisting of 25 years to life for murder (count 1), 25 years to life for the gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (d)), and one year for the prior prison term (§ 667.5, subd. (b).) The sentence on count 3, shooting from a motor vehicle, was stayed under section 654.

Flores received a sentence of 50 years and 8 months to life, consisting of 50 years to life for the murder conviction, gang and firearm enhancements (count 1), plus a consecutive 8-month term for the unlawful firearm activity conviction (count 2). The sentence on count 3, shooting from a motor vehicle, was stayed under section 654.

and the front passenger asked the men where they were from. Perez replied, "'We are not from anywhere.'' Perez grabbed the barrel of the rifle and tried to wrestle it away. Three or four shots were fired, and Perez let go of the barrel. Guerrero was shot in the arm and chest, and died from his injuries.

Later that night, Perez told police the shooter was a bald male with facial hair and big eyes. Perez also said the shooter might have been wearing a "hoody." Two days after the shooting, Montenegro and Perez worked with a police sketch artist to create a composite sketch of the shooter. Several weeks after the shooting, Montenegro and Perez were shown a photographic lineup that included Flores. They each identified Flores as the possible shooter, but neither was certain of his identification. Several months later, Montenegro and Perez identified Flores as the possible shooter during a live lineup; again, neither was certain of his identification.

Montenegro and Perez identified Flores as the shooter at both the preliminary hearing and trial. At trial, Montenegro testified that he was "sure" of his identification of Flores, and Perez testified that he was "80 percent" certain of his identification of Flores. Perez explained that his degree of certainty had grown from 50 percent at the preliminary hearing to 80 percent at trial because "I don't think it's a coincidence that the sketch that we did looks like him. The picture that I was shown looks like the guy. I picked him out, and the lineup again." Both Montenegro and Perez testified that the composite sketch, which was presented as an exhibit at trial, accurately depicted the shooter.

On cross-examination, Perez testified that of the individuals depicted in the photographic lineup, Flores had the shortest hair and the only moustache, and was wearing a hoody. Montenegro testified on cross-examination that Flores was the only individual who had appeared in both the photographic and live lineups.

The eyewitness identifications of Flores were buttressed by testimony of an informant, Jose Andalon, the purported shot-caller for the Pacoima Southside Locos (PSSL) gang. Andalon testified against both defendants in this case, in exchange for dismissal of numerous charges and a favorable sentence in his unrelated burglary case. Both juries were informed of Andalon's criminal background and plea agreement.

3

### A. Andalon's Testimony

Andalon testified that he was a founding member of the Little Pacoima gang, which became affiliated with the PSSL gang (jointly, the PSSL gang). Andalon claimed to be the PSSL gang's shot caller (i.e., the person who decides what crimes to commit) when this shooting occurred. He identified Montoya and Flores as members of that gang, and said he loved Montoya—a trusted member of the gang—like a sister.

The PSSL's rival gang is the Pacoima Van Nuys Boys (PVNB) gang and its clique, Anybody Killer (ABK). Two months before the shooting in this case, Flores told Andalon that he had stabbed a PVNB gang member who was chasing him, that other PVNB gang members had followed him home, written on his wall, and were looking for him. One month before the shooting in this case, Andalon gave Flores a rifle. In early December 2008, PVNB members shot several PSSL members on Wingo Street. The shooting in this case occurred on December 28, 2008, a few weeks after the shooting on Wingo Street.

Hours after the shooting in this case, Flores called Andalon and said, "I smoked the fools," meaning he had killed a rival gang member. Flores told Andalon that after he learned that PVNB or ABK gang members were outside on Correnti Street, they went in Vital Gomez's car (Gomez is a PSSL gang member)[5] to Correnti Street where some people were standing outside. Flores asked where they were from, then fired the gun until the clip was empty. The deceased victim, Guerrero, was wearing a hat with the letter "A," which is the insignia of the ABK gang. Flores said that he had gotten back for what they had done to him.

After receiving this news, Andalon immediately called Montoya at her workplace to say, "what the fuck happened?" Montoya said she could not talk on her work phone, so Andalon called her back on her cell phone. Montoya told Andalon that while she and

---

[5] After the shooting in this case, police searched Gomez's car, a white Chevy Malibu, and recovered a .22 caliber long rifle bullet. The bullet was consistent with the bullet fragment recovered from Guerrero's body.

Flores were "getting high on PCP," they discussed the shooting on Wingo Street and the incident where Flores got "jumped." They both felt they had to do something, and they walked to Flores's house where Flores retrieved the rifle. They walked back to Montoya's house, carrying the rifle between them "like they were a couple, hugging." When they arrived at her house, they learned that PVNB or ABK gang members "were hanging out outside on Correnti." Montoya took Gomez's car keys and drove Flores, who was in the front seat, and Jose Euyoque (known as Gordo), who was in the back seat, to Correnti Street. Montoya made a U-turn, turned off the headlights, and drove up to a group of people in front of a house. Flores "got out, told them where they were from. Before he even answered, he pulled the trigger and shot them." On the way home, Montoya damaged Gomez's car by hitting a curb.

Andalon told Montoya that she "didn't need to do that shit." Montoya replied that she knew what she was doing and was a grown woman.

Later that day, Flores gave Andalon more details about the shooting. Flores said that he and Montoya "were getting high," they "walked from his house" with the "gun between them," and they learned "that the Van Nuys Boys or ABK were outside on Correnti, which is where they hang out at." They drove to Correnti Street in Gomez's car, and saw some people outside. Flores "pulled the trigger. He said he didn't know the gun was automatic," and he fired until "the whole clip went out."

Andalon testified that he was in charge of the gang when the shooting occurred, but denied ordering the shooting. The gang had agreed to keep the shooting a secret after learning that Guerrero, the victim, was a "police explorer" and "it was a big deal." Andalon claimed that because he had snitched on defendants, there was a "hit" on his life, and his family members would have to relocate.

5

*B.*    *Montoya's Custodial Statement to Police*

When Montoya was arrested and interviewed about this shooting, she gave a taped statement that was played at trial for her jury only.

During the interview, Montoya stated that on the night of the shooting, Gomez, Gordo, Flores, and three girls had been at her house. She walked with Flores to his house and waited outside while he went inside to get money. They then walked back to Montoya's house. Montoya drove Gordo and Flores in Gomez's car to buy some beer. Flores was in the front passenger seat. She did not see a gun. Flores said that he wanted to find "Ducky," and told her where to turn. ("Ducky" was a member of ABK and lived in PSSL territory.) When Montoya turned onto Correnti Street, she saw a group of men. Flores exchanged words with someone. Multiple gunshots were fired from the passenger's side of the car. She drove away and damaged the car while returning home.

When they returned to her house, Montoya asked Gordo and Flores "what the fuck" happened. Gordo stated, "You let him have it," and Flores answered, "Yeah, it got stuck." Flores told Gordo that the victim was not Ducky. Flores gave Gordo the gun so he could get rid of it. Later, they had a meeting at which Gordo told everyone to keep quiet about the shooting. Montoya said that she was worried about people thinking she was a snitch, but she was "not going to go down for this shit."

*C.*    *Flores's Defense Evidence*

Flores sought to impeach the prosecution's eyewitness identification evidence through the testimony of Dr. Mitchell Eisen, a psychologist. Dr. Eisen testified that memories can be altered over time for various reasons. He was presented with a hypothetical that mirrored the process through which Montenegro and Perez eventually identified Flores as the shooter in this case. Based on the hypothetical, Dr. Eisen testified that when a witness assists in creating a composite sketch, and selects a suspect who resembles the composite sketch from a photographic lineup, the witness' subsequent identifications of the same suspect could be influenced by the witness' desire to remain consistent and by the "carry over effect" of seeing a familiar face from an earlier photographic lineup.

6

Officer Pedro Cabunoc testified that when Andalon was arrested for burglary in October 2008, Andalon had sought to provide information on another matter. Andalon told Cabunoc that he was "just trying to see if I can get out of this."

Detective Joshua Byer testified that when Andalon was first interviewed concerning this case, Andalon said that an unknown Malibu car was used in the shooting, that Flores was alone, and he did not know where Flores had obtained the gun. At the next interview, Andalon said that Flores was with Montoya during the shooting, the car was Gomez's, and Andalon had given the gun to Flores.

Corina Flores, the mother of Flores's children, testified that Flores was at her house at the time of the shooting, and that Flores never brought a gun to her house. She denied that Flores was living with his mother on Osborne Street at the time of the shooting.

### D.     Montoya's Defense Evidence

Montoya presented evidence that she had tested negative for drugs on 24 occasions between February 2008 and February 2009. However, she did not test for drugs between December 25 and 30, 2008.

Montoya's employer, Rogelio Flores, testified that in December 2008, Montoya was working for a graffiti removal organization. Montoya's coworker, Otto Portillo, testified that Montoya had asked him to remove PSSL graffiti in Pacoima on many occasions.

As to Andalon's alleged telephone conversation with Montoya, the store manager for AT&T in Panorama City—Antonio Alvarado—testified that AT&T did not have a record of a call between phone numbers ending in 7711 and 1228, during the period December 26, 2008, to January 9, 2009. However, because a business may have several routing phone numbers, it was possible that a call made to the 7711 number could have appeared on the statement as a different number.

7

## DISCUSSION

While this case was pending, the California Supreme Court issued its opinion in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which addressed the natural and probable consequences doctrine and related pattern jury instruction. In light of that ruling, we vacated the submission of this matter and requested further briefing by the parties on the application of the *Chiu* decision to this case.[6] We received and considered those letter briefs, and rescheduled the matter for oral argument.

In part I of the discussion, we address Flores's contentions, including his claim of instructional error regarding the natural and probable consequences doctrine. In part II, we address Montoya's argument concerning the same instructional error. In part III, we discuss custody credits.

## I

### A.  *Montoya's Extrajudicial Statements to Andalon*

There was evidence that Montoya told Andalon that she wanted to do something about a prior shooting on Wingo Street; she went with Flores to get the gun; she got the keys to a car and drove Flores to look for rival gang members on Correnti Street; she drove past a house where she saw a group of people, circled back with the headlights off, and stopped the car while Flores shot at them; and after the shooting, she drove them back to her house. Flores argues these statements were inadmissible hearsay and should have been excluded under Evidence Code section 352.

Respondent argues the statements were properly admitted under the declaration against interest exception to the hearsay rule. The exception, in Evidence Code section 1230, provides in relevant part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is

---

[6] The parties do not dispute that *Chiu* is retroactive and applies to this case. The decision changed the law by disapproving the use of the natural and probable consequences theory as a basis to elevate murder to first rather than second degree. (See *In re Johnson* (1970) 3 Cal.3d 404, 410–411 [retroactivity of decisions announcing a new rule of law].)

unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

Both parties agree that Montoya was unavailable as a witness for purposes of Evidence Code section 1230.  (*People v. Leach* (1975) 15 Cal.3d 419, 438 (*Leach*).) They also agree that no reasonable person in Montoya's position would admit to participating in a drive-by shooting that he or she did not commit.  The parties disagree, however, as to the admissibility of the portions of Montoya's statements that implicated Flores.

1.     Evidence Code Section 1230

Flores contends that Montoya's statements regarding his involvement in the shooting were inadmissible because they were not specifically disserving to Montoya's interests.  His contention is based on the Supreme Court's statement in *Leach*, that "[i]n the absence of any legislative declaration to the contrary, . . . the exception to the hearsay rule relating to evidence of declarations against interest set forth in section 1230 of the Evidence Code [is] inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the *declarant*."  (*Leach*, *supra*, 15 Cal.3d at p. 441–442, fn. omitted, italics added.)

When deciding whether such statements are admissible under Evidence Code section 1230, the trial court must make "a careful analysis of what was said and the totality of the circumstances.  (*People v. Wilson* [(1993)] 17 Cal.App.4th [271,] 276 ['The fact that the statement is also disserving to [nondeclarant] does not render the statement unreliable and inadmissible. . . .']; *United States v. Sasso* [(2d Cir. 1995)] 59 F.3d [341,] 349; *People v. Gordon* [(1990)] 50 Cal.3d [1223,] 1252–1253 [overruled on other grounds in *People v. Edwards* (1991) 54 Cal.3d 787, 835].)"  (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 (*Greenberger*).)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception.  The trial court must [consider factors such as] whether the declarant spoke from personal knowledge, the possible

9

motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334.)

In *Greenberger*, a police informant secretly recorded his private conversations with defendants Mentzer and Lowe, who each made statements that were self-inculpatory and inculpatory of a codefendant. In concluding their statements were admissible as declarations against interest, we noted that "the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.)

Although self-inculpatory statements are generally more reliable than those that shift responsibility to others (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335), a statement that is inculpatory of another person is not necessarily unreliable. For example, in *People v. Wilson*, *supra*, 17 Cal.App.4th 271, the defendant told his wife (Mrs. Wilson) "that the gun 'he had used to shoot the Mexicans' was hidden in the bushes." (*Id.* at p. 276.) Mrs. Wilson reported the defendant's statement to police, and her statement (which incorporated the defendant's statement) was admitted at trial. In affirming the defendant's conviction, the court found the statement met the requirements for declaration against interest exception because it placed her at risk of being charged as an accessory. The fact that her statement also was disserving to the defendant's penal interest did not render the statement unreliable and inadmissible. (*Ibid.*)

In *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*), defendant Morales made statements to a friend that were self-inculpatory and inculpatory of his codefendants. The friend testified to Morales's statements, which were admitted at trial as declarations against interest. The appellate court affirmed, finding the statements met the requirements of Evidence Code section 1230 because they subjected Morales "to the risk of criminal liability to such an extent that a reasonable person in his position would not have made the statement unless he believed it to be true." (*Id.* at p. 175.)

In *People v. Arauz* (2012) 210 Cal.App.4th 1394, a jailhouse conversation between defendant and his cellmate was secretly recorded. Defendant's statements, which were self-inculpatory and inculpatory of a codefendant, were admitted at a joint

10

trial as declarations against interest. In affirming that ruling, the appellate court found the statements were specifically disserving of the declarant's penal interests and, because they were not testimonial, they were not subject to the Confrontation Clause. (*Id*. at p. 1397.)

In this case, Montoya's statements to Andalon were made during a private telephone conversation. Montoya discussed Flores's role in the shooting, which she personally witnessed, but did not attempt to shift blame from herself. On the contrary, she freely and openly discussed her desire to respond to a prior gang shooting; her active role in obtaining the gun, the car key, and driving the vehicle used in the shooting; and her capacity as a grown woman to make her own decisions. Under the circumstances, we find Montoya's statements were highly inculpatory and no reasonable person in her position would have made them unless he or she believed they were true. We therefore conclude that her statements "bear sufficient indicia of trustworthiness and fall within the declaration against interest exception." (*People v. Arceo* (2011) 195 Cal.App.4th 556, 577 (*Arceo*).)

Finally, we address the issue of prejudice. Even if we were to find that Evidence Code section 1230 did not apply to Montoya's extrajudicial statements, we would find no prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [a miscarriage of justice should be declared only when the court, after examining the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error]; *People v. Duarte* (2000) 24 Cal.4th 603, 618–619 [*Watson* standard applies to erroneous admission of hearsay].)

We are not persuaded that the exclusion of Montoya's statements would have resulted in a more favorable outcome for Flores. Perez and Montenegro independently identified Flores as the shooter. Their percipient identification testimony, Flores's self-incriminating statements to Andalon, and the physical evidence—the discovery of a bullet (matching the type of bullet found in the victim's body) in Gomez's car—provided sufficient independent evidence of Flores's guilt to sustain his conviction. On this

11

record, it is not reasonably probable that Flores would have obtained a more favorable result if the statements had been excluded.

### 2. Confrontation Clause

Having determined that Montoya's statements were admissible as declarations against interest, we next consider Flores's Confrontation Clause claim. The dispositive issue is whether Montoya's statements to Andalon were testimonial. As explained in *Davis v. Washington* (2006) 547 U.S. 813, only testimonial evidence can cause a declarant to be a witness within the meaning of the Confrontation Clause. (*Id.* at p. 828.) The Confrontation Clause does not apply "to out-of-court nontestimonial statements (*Whorton v. Bockting* (2007) 549 U.S. 406, 420; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812, including statements by codefendants. [Citations.])" (*Arceo*, *supra*, 195 Cal.App.4th at p. 571; *Cervantes*, *supra*, 118 Cal.App.4th at p. 177 [codefendant's nontestimonial statement was properly admitted against defendants, because statement qualified as declaration against interest and satisfied constitutional standards of trustworthiness.].)

Although it is clear the Confrontation Clause applies only to testimonial evidence, the Supreme Court has not provided a comprehensive definition of the term "testimonial." The Court has acknowledged this, stating: "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Crawford v. Washington* (2004) 541 U.S. 36, 68.)

Notwithstanding the lack of a comprehensive definition, we have found no cases, nor have the parties cited any, that hold a private conversation between friends to be testimonial. We are satisfied that Montoya's extrajudicial statements would not be deemed testimonial even under a very broad definition of that term.

12

Because the Confrontation Clause does not apply to nontestimonial statements, we conclude that redaction of Flores's name was not required under *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518. (*Arceo*, *supra*, 195 Cal.App.4th at p. 571 [*Bruton* rule, like Confrontation Clause, does not apply to nontestimonial statements]; *Cervantes*, *supra*, 118 Cal.App.4th at pp. 176–177 [same]; *Greenberger*, *supra*, 58 Cal.App.4th at p. 332 [same].)

B.      *Accomplice Instruction*

Flores contends that because Andalon is an accomplice, and because a conviction cannot be sustained on uncorroborated accomplice testimony (*People v. Garcia* (2000) 84 Cal.App.4th 316, 325), the trial court was required to provide a cautionary instruction on its own motion regarding accomplice testimony.

Generally, "an instruction on accomplice testimony must be given on the court's own motion when the accomplice is called solely by the prosecution. [Citations.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 566.) A witness is an accomplice if he or she "'is liable to prosecution for the *identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citations.]" (*People v. Felton* (2004) 122 Cal.App.4th 260, 268, quoting *People v. Arias* (1996) 13 Cal.4th 92, 142–143.)

In this case, Andalon provided the murder weapon to Flores a month before the shooting, but there is no evidence that he knew Flores intended to kill someone with it then or a month later. "It is well settled that aiding and abetting the commission of a crime requires some affirmative action. The mere knowledge or belief that a crime is being committed or likely to be committed, and the failure on the part of the one having such knowledge or belief to take some steps to prevent it, in no sense amounts to aiding and abetting." (*People v. Weber* (1948) 84 Cal.App.2d 126, 130.) "'Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice.' [Citations.] An accomplice must '*share*[] *the perpetrator's criminal purpose*'; even providing 'assistance with *knowledge* of the perpetrator's

13

criminal purpose' is insufficient. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 430.)

Under the circumstances, we are not persuaded that providing the murder weapon to Flores one month before the killing made Andalon an accomplice as a matter of law. At most, Andalon is a possible accomplice in light of his testimony that he was in charge of the gang when the killing occurred. Whether he intended to aid and abet the shooting of Guerrero is a question of fact. Given Andalon's express denial that he ordered the shooting, the record does not establish that he is an accomplice as a matter of law.

In any event, even if we assume that Andalon is an accomplice, "[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] '"[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 562–563.)

As discussed, Perez and Montenegro independently identified Flores as the shooter. Their testimony, coupled with the physical evidence—the discovery of a bullet (which matched the type of bullet found in the victim's body) in Gomez's car (which fit the description of the vehicle used in the shooting)—provided sufficient corroboration to cure the alleged instructional error.

Flores also contends the court erred by failing to instruct, sua sponte, that Montoya was an accomplice whose extrajudicial statements required corroboration and were to be viewed with caution. In *People v. Brown* (2003) 31 Cal.4th 518, 555–556, the Supreme Court held that where an accomplice's extrajudicial statements were made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule—namely, they were declarations against interest—the court is not required

14

to instruct the jury to view the accomplice's extrajudicial statements with caution and to require corroboration. As we have discussed, Montoya's statements to Andalon were properly found to be declarations against penal interest. (Evid. Code, § 1230.) Where that is the case, the usual problem with accomplice testimony—that it is self-interested and shifts blame to codefendants—is not present, and the instruction on accomplice testimony is not required. (*Brown*, *supra*, 31 Cal.4th at pp. 555–556.)

In any event, "'[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" . . . The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.].' (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)" (*Brown*, *supra*, 31 Cal.4th at p. 556.) Even if we were to assume the trial court erred by failing to instruct sua sponte on accomplice testimony, the error was harmless for the reasons previously discussed.

### C.    Natural and Probable Consequences Instruction

The trial court instructed the jury that if it found Flores guilty of murder, it must decide whether the crime was first or second degree murder. The jury was informed that the prosecution was pursuing two theories of first degree murder: willful, deliberate, and premeditated murder, and murder committed by shooting a firearm from a motor vehicle.

In addition, the jury for Flores was instructed that the prosecution was "relying upon the natural and probable consequences theory." It received an instruction that, "Under the natural and probable consequences theory of murder, before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault with a deadly weapon. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault with a deadly weapon; [¶] 2. During the commission of assault with a deadly weapon a co-participant in that assault with a deadly weapon committed the crime of murder; and [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that

15

the commission of the murder was a natural and probable consequence of the commission of the assault with a deadly weapon." The term "co-participant" was defined as either the "perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander."

As we have discussed, in *Chiu* the Supreme Court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*Chiu*, *supra*, 59 Cal.4th at p. 158–159.) Flores, who was tried as the perpetrator who fired the fatal shots, was not tried on a theory of aiding and abetting. The instruction did not apply since Flores, if guilty at all, was the shooter. Accordingly, we agree with his contention that the instruction on the natural and probable consequences doctrine, which applies to aiders and abettors, should not have been given. But any error was harmless under any standard.

According to *Chiu*, "[w]hen a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129; *People v. Green* (1980) 27 Cal.3d 1, 69–71 [overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 234].)" (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

In this case, the jury was properly instructed that "[a] defendant is guilty of first degree murder if the People have proved that he or she acted willfully, deliberately and with premeditation. The defendant acted willfully if he or she intended to kill. The defendant acted deliberately if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he or she decided to kill before completing the act that caused death." In closing argument, the prosecutor argued that the jury could convict Flores of first degree murder under either one of two theories—"willful, deliberate and premeditated first degree murder," or "shooting from a motor vehicle"—and so long as

16

all 12 jurors found Flores guilty under either of those theories, nothing more was required.

The record contains ample support for Flores's conviction under the legally correct theory of willful, deliberate, and premeditated murder. The record also contains ample support for Flores's conviction under section 189, which provides that "any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree."

As previously mentioned, the evidence showed that after discussing the need to do something about the prior shooting by a rival gang on Wingo Street, Flores and Montoya went to his house to retrieve a rifle, which they brought back to her house. Upon learning that rival gang members were standing outside on Correnti Street, they drove to that street and saw several men, including one (Guerrero) who was wearing a cap with a rival gang's insignia. Flores fired shots at the group, killing Guerrero. Flores was positively identified by Montenegro and Perez—in a photographic lineup, a live lineup, the preliminary hearing, and at trial—as the shooter in the front passenger seat who issued a gang challenge before firing at them.

A key factor in determining whether a defendant acted with premeditation and deliberation is the extent to which he or she reflected on the decision to kill. (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1114–1115.) As noted in *Nazeri*, other courts have found there was sufficient evidence of premeditation and deliberation where the defendant entered a house and obtained a steak knife from the kitchen before engaging in a frenzied knife attack (*People v. Perez* (1992) 2 Cal.4th 1117), where the defendant returned to his car to get a rifle and ammunition before committing the murders (*People v. Thomas* (1992) 2 Cal.4th 489), and where the defendant committed the additional act of slashing the victim's throat after the victim was strangled to the point of unconsciousness (*People v. Lewis* (2009) 46 Cal.4th 1255). (*Nazeri*, *supra*, 187 Cal.App.4th at p. 1115.)

17

When Flores's planning activities are measured against the activities in these other cases, we are satisfied beyond a reasonable doubt that the jury based its first degree murder verdict on the legally valid theory that Flores committed an intentional, deliberate, and premeditated murder. We conclude that on this record, any instructional error concerning the natural and probable consequences doctrine was harmless under the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18, 22–24 (*Chapman*).)

### D.        *Prosecutorial Misconduct*

On direct examination, the prosecution's gang expert, Officer Timo Peltonen, testified that in his opinion, Flores was a member of the PSSL gang. When asked to state the grounds for his opinion, Peltonen listed a number of factors—including Flores's admission that he was a gang member, his gang moniker, his association with known gang members, his gang tattoos—but ended with "*the fact that he committed this murder in association with two other gang members.*" (Italics added.) Upon defense counsel's immediate objection, the jury was admonished to disregard Peltonen's statement that Flores "committed this murder," which was stricken from the record. The trial court told the jury that "whether or not Mr. Flores is guilty of murder is for you to decide."

Outside the presence of the jury, Flores moved for a mistrial. The trial court denied the motion, stating that the improper language had been stricken and the jury had been instructed to disregard it. The court ordered Peltonen to "refrain from referring to any such conclusion that Mr. Flores murdered anyone in this case." There is no indication of any repeat episode or that the matter was referred to by counsel during closing argument.

On appeal, Flores contends the prosecutor committed misconduct in eliciting Peltonen's statement that "Flores committed this murder." Although Peltonen should not have made the statement, there is no indication that the statement was elicited by the prosecutor. Defense counsel's immediate objection was met by the trial court's swift and proper admonishment to disregard the comment, which was stricken. We conclude that any prejudice from the improper remark was cured by the trial court's timely admonishment. (*People v. Mendoza* (2007) 42 Cal.4th 686, 702 [when defendant's

18

objections are sustained and jury is admonished to disregard improper comment, it is assumed jury complied and no prejudice resulted].)

### E. Identification Evidence

Flores contends that his conviction must be reversed for insufficient identification evidence. We conclude the eyewitness identification testimony of Montenegro and Perez provided substantial evidence to support his conviction.

Flores argues the eyewitness identifications were unreliable because the photographic lineup was followed by a live lineup and he was the only person who appeared in both lineups. Flores's expert witness, Dr. Eisen, explained the possible problems with eyewitness identifications, including the "carry over effect" of seeing a familiar face from an earlier photographic lineup.

It is the jury's role to assess the eyewitness identifications in light of the composite sketch of the shooter, the six-packs used in the photographic lineups, and Dr. Eisen's expert testimony. As to Dr. Eisen's testimony, the jury was instructed that it must consider an expert's opinions, but need not accept them as true or correct, and should evaluate the believability of an expert witness like any other witness. As to the hypothetical questions posed to Dr. Eisen, the jury was told to "decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

Where, as here, the eyewitness identification testimony is believed by the jury, the reviewing court will not reweigh the evidence. (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) "'The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . .' [Citation.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) "[W]hen the circumstances surrounding the identification and its weight are explored at length at trial" and the jury believes the eyewitness identification testimony, that

19

evidence is sufficient to prove the defendant's identity. (*In re Gustavo M.*, *supra*, 214 Cal.App.3d at p. 1497; *People v. Anderson* (2001) 25 Cal.4th 543, 570–575.)

Flores contends that Andalon's testimony was not to be believed because the testimony of a snitch is tainted and unreliable. However, Andalon's motives and credibility were a jury question, as Flores's counsel highlighted in closing argument: "It's Shady [Andalon's gang moniker]. It's Shady. It's Shady. It's Shady. That's who did this. And he can't wait for you to convict my client, because now he's done. And when he's done with his 12 years, 'La de da, I skipped out on eleven life sentences.' It was worth it." Counsel argued: "It's [Gomez's] car" and "Shady's gun." "Notice that Shady protected both himself and . . . Gomez. Willing to give everybody up, everybody he knows. 'Lettie [Montoya], I love her,' but she's gone. Jose Euyoque, aka Gordo. Friend, but he's gone. He was there, too."

In this case, the jury was instructed on the factors to be considered in evaluating eyewitness identification testimony. It was also instructed to consider the motives of each witness, including any promise of leniency in exchange for his or her testimony. Where, as here, these issues have been thoroughly explored at trial, the appellate court will defer to the jury's factual findings that, as in this case, are supported by substantial evidence.

## II

We turn to Montoya's appeal, which also challenges the natural and probable consequences instruction in light of *Chiu*, *supra*, 59 Cal.4th at p. 158–159.[7] We agree that the natural and probable consequences instruction should not have been given to Montoya's jury. The issue, accordingly, is whether the error was prejudicial.

---

[7] Montoya's jury was instructed that a first degree murder conviction under the natural and probable consequences doctrine required findings that: (1) Montoya was guilty of the target offense, assault with a deadly weapon; (2) during the commission of the target offense, a co-participant committed the crime of murder; and (3) under all of the circumstances, a reasonable person in Montoya's position would have known that the commission of the murder was a natural and probable consequence of the target offense.

Montoya's jury was presented with two theories of first degree murder: willful, deliberate, and premeditated murder, and murder committed by shooting a firearm from a motor vehicle. The prosecution argued that Montoya was guilty of first degree murder under a direct aiding and abetting theory. In light of this theory, the trial court instructed that the prosecution must prove: "1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." Montoya's jury also was instructed that in order to aid and abet a crime, the defendant must know of the perpetrator's unlawful purpose and specifically intend to aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.

Montoya's jury received both the legally valid theory that a defendant who directly aided and abetted a premeditated murder may be convicted of first degree murder, and the legally invalid theory that an aider and abettor may be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Where, as here, a jury receives instructions on two theories of guilt, "one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.]" (*Chiu*, *supra*, 59 Cal.4th at pp. 167–168.)

In *Chiu*, the defendant's conviction was reversed because the record failed to demonstrate that the invalid natural and probable consequences instruction was harmless. But in this case, the record shows that Montoya, if guilty at all, was guilty of first degree premeditated murder.

The guilty verdict on count 3, shooting from a motor vehicle, indicates the jury rejected Montoya's exculpatory account of the shooting (provided during her custodial interview) in favor of her inculpatory statements to her friend Andalon. Her actions were identical to those of Flores, except that she drove the car while he pulled the trigger. The evidence showed that after actively planning and preparing to kill rival gang

21

members on Correnti Street, Montoya and Flores executed their plan by going to that location and committing a drive-by shooting against suspected rival gang members. By her own conduct and incriminating statements to Andalon, Montoya demonstrated that she possessed the necessary mental state to be convicted of first degree premeditated murder. (*People v. Nazeri*, *supra*, 187 Cal.App.4th at pp. 1114–1115 [premeditation and deliberation are present if the jury could find a sufficient extent of reflection on the decision to kill]; *People v. Thompson* (2010) 49 Cal.4th 79, 118 [evidence supported defendant's first degree murder conviction based on the theory that defendant aided and abetted a premeditated murder by intentionally maneuvering the victim to an isolated area where defendant and his companion carried out their plan to rob and kill the victim, using the gun that defendant had supplied for that purpose].)

On this record, we are satisfied beyond a reasonable doubt that the jury based its first degree murder verdict on the legally valid theory that Montoya directly aided and abetted an intentional, deliberate, and premeditated murder. (*Chapman*, *supra*, 386 U.S. at pp. 22–24.) We conclude the instructional error was harmless.


### III

Finally, we turn to the issue of presentence custody credits. Montoya contends the trial court erroneously failed to award her any presentence custody credits. (See *People v. Johnson* (2010) 183 Cal.App.4th 253, 289 [statutory prohibition against work time and conduct credits for convicted murderers does not apply to presentence custody credits].) The Attorney General agrees that Montoya is entitled to presentence custody credits. The parties have calculated that 921 days of presentence custody credits should be awarded to her.

A sentence that fails to award legally mandated presentence custody credit is unauthorized and may be corrected when discovered. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) We direct the trial court on remand to prepare a corrected abstract of judgment for Montoya that reflects 921 days of presentence credits.

22

As to Flores, the Attorney General contends the abstract of judgment must be corrected to show one additional day of presentence custody credits, which would increase his presentence custody credits from 925 days to 926 days. However, the Attorney General also argues that Flores should not have received any conduct credit, and seeks to deduct 138 days of conduct credit that he erroneously received in violation of section 2933.2. We conclude the Attorney General is correct on both points. We direct the trial court on remand to prepare a corrected abstract of judgment for Flores that awards 926 days of presentence custody credits and no conduct credits.

## DISPOSITION

The judgment is modified to reflect an award of 926 days of presentence custody credits and no conduct credits as to Flores, and 921 days of presentence custody credits as to Montoya. The clerk of the superior court is ordered to prepare an amended abstract of judgment as to each defendant, and to transmit the amended abstract to the Department of Corrections and Rehabilitation. The judgment, as modified, is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.